UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CASE NO.: 3:06CV-282-H

MONIKA BURKHEAD, et al.                                          PLAINTIFFS

V.

LOUISVILLE GAS & ELECTRIC CO.                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiffs are residents of various neighborhoods surrounding a power plant that is operated by Defendant Louisville Gas & Electric ("LG&E"). They brought suit in June 2006 alleging nuisance, negligence, gross negligence, strict liability and trespass based on the presence of particles and odors on their property that are allegedly the result of LG&E's emissions.

Several motions are currently before the Court, including Plaintiffs' Motion to Name New Experts Based on Denied Evidence, in which Plaintiffs request permission to name four additional experts, in part because Defendant allegedly withheld five relevant reports. (DN 126.) This motion is significant because the outcome could determine the viability of some of Plaintiffs' claims.

Though this Court is often amenable to extensions when the press of business warrants them, this is not such an instance. The Court will deny Plaintiffs' motion for three reasons: 1) the request comes six months to a year after the relevant expert deadlines, 2) Plaintiffs had prior notice that different experts would be beneficial and failed to secure them and 3) none of the reports allegedly withheld by Defendant raise issues that were not previously apparent.

Also before the Court are Defendant's three Motions to Dismiss based on alleged discovery violations, including failure to appear for depositions, (DN 147), failure to permit inspection of their property, (DN 148), and failure to respond to written discovery, (DN 149). Additionally, Plaintiffs have filed a Motion for a Protective Order, requesting an order requiring Defendant to take depositions at time and place convenient to Plaintiffs. The Court will deny all three of Defendant's Motions to Dismiss and partially grant Plaintiffs' Motion for a Protective Order.

I.

Plaintiffs filed this case as a putative class action in Jefferson Circuit Court in June 2006; Defendant removed to federal court and the parties proceeded with class discovery. On March 21, 2008, after holding a class certification hearing, this Court denied Plaintiffs' motion to certify a class comprised of those residing within two miles of the LG&E plant. The Court's denial was based in part on the insufficiency of Plaintiffs' expert evidence, which did not distinguish the members of the class from the public at large. The Court went to great lengths, both in the hearing and in its subsequent Opinion denying class certification, to explain how the expert reports were lacking, and what additional expert evidence the Plaintiffs should obtain.[1]

Thereafter, the parties established a discovery schedule for the case-in-chief, and the Court permitted numerous individuals to join the case, which now comprises more than 200 Plaintiffs. After a handful of extensions to the discovery schedule, the deadline for Plaintiffs'

---

[1] Since 2006, Plaintiffs' lead counsel has filed at least six other putative class action cases in this Court. Each case involves similar claims of nuisance, negligence and trespass based on emissions or odors emanating from chemical manufacturing or electrical generating facilities. The parties have settled some of these cases; other cases are in various stages of litigation. Because of this, Plaintiffs' counsel has had numerous opportunities to obtain the Court's input on issues related to expert reports and testimony.

expert witness disclosures – except for the real property valuation expert – was set for April 16, 2009. (Consent Amended Scheduling Order, Nov. 25, 2008, Dkt No. 99.) The deadline for Plaintiffs' real property valuation expert was set for July 6, 2009. (Consent Amended Scheduling Order, June 19, 2009, Dkt. No. 110.) The parties dispute whether those deadlines were met, but it appears that within that general time frame, Plaintiffs did submit odor or particle reports from Bureau Veritas and Stephen Paul of Enviroair and a valuation report from William Patrick Ryder.

At some point after those deadlines passed, Plaintiffs independently obtained five documents that they claim were responsive to previous discovery requests but that Defendant had not provided. Those documents are best described as (1) two government-required "STAR" reports from 2006 and 2007, which use Defendant's emissions data (data previously provided to Plaintiffs) along with a formula, to project, theoretically, where the plant's emissions might fall; (2) a 1992 sulfur dioxide report showing that sulfur dioxide falls up to 3.2 miles from Defendant's smokestack; (3) a 1993 wind report showing that Defendant's fallout reaches Plaintiffs' neighborhoods; and (4) a 1997 meteorological report that tracked weather patterns from that time. The parties dispute whether Plaintiffs' requests included those documents.[2]

In October 2009, Plaintiffs filed the present motion, requesting permission to name three new emissions experts and a new real property valuation expert. Defendant objected. On December 21, 2009, the Court held a hearing to discuss this and other pending discovery matters. Because Plaintiffs' reasons for requesting new emissions experts are different from their reasons for requesting a valuation expert, the Court will address them separately.

---

[2] It appears that the 1992, 1993 and 1997 reports were properly excluded because Defendant notified the Plaintiffs that it was limiting the scope of its responses to the year 2000 and later, and Plaintiffs did not object.

II.

Plaintiffs argue that the reports allegedly withheld necessitate "commentary" from three new experts: Ranajit Sahu, James Riffle and David Mitchell. Sahu, an expert on the combustion process, would opine on where the discharge from Defendant's plant falls, based on the 2006 and 2007 STAR Reports. Riffle would comment on the composition of the discharge. Mitchell, a meteorology expert, would address the wind and weather reports.

According to Plaintiffs' counsel, the three experts would primarily comment on the reports, though they may offer some independent analysis. The Court is perplexed by this assertion; clearly, it would be unusual for an "expert," who did not offer his or her own report, to merely comment on another report containing data that was otherwise independently available. Additionally, the relationship between the allegedly withheld reports and the need for new experts is weak at best. Nonetheless, the Court will consider the motion.

As noted above, Plaintiffs brought their case more than three years ago, and the deadline for naming new experts passed in April. Thus, Plaintiffs must present a compelling reason for this Court to allow the new experts.[3]

A.

Plaintiffs propose to add Ranajit Sahu to comment on the 2006 and 2007 STAR Reports.[4] However, LG&E has previously supplied Plaintiffs with all of the underlying emissions data used in the STAR Reports. The only new information contained in those reports is theoretical –

---

[3] The Court does not reach the question of the reports' admissibility. However, if the reports are admissible, Plaintiffs' counsel is free to cross examine appropriate defense witnesses about the reports.

[4] It is unclear whether the existing discovery requests required LG&E to produce these reports.

in that it is based on a government *formula* for determining where the discharge could fall. Plaintiffs could easily have hired an expert, such as Mr. Sahu, several years ago and certainly *before* April 2009, to create their own formula or perform a similar analysis on where the discharge might actually fall.[5]

Furthermore, the Court suggested to Plaintiffs' counsel on numerous occasions that such an expert would be helpful. For instance, in the March 2008 class certification hearing, the Court questioned Plaintiffs' counsel on the lack of expert evidence related to where the discharge falls, stating: "I don't think anybody denies there are emissions of some sort of another. *The issue, it would seem to me is, number one, where do they go,* and when they go someplace, to what extent do they constitute a nuisance or a harm?" (Transcript of class certification hearing, March 3, 2008, p. 8.) The Court also addressed the issue in its March 2008 Opinion denying class certification, when it noted that "[t]he Court has repeatedly pressed for an evidentiary relationship between the geographic boundaries of the proposed class definition and the alleged exposure zone of pollution. Yet at bottom, Plaintiffs rest their motion upon complaints of residents in a single, geographically-confined area about various substances and odors on their property, and lengthy recitals of the emissions of the LG&E facility." (Memorandum Opinion, March 20, 2008, p. 8.)

These are just a few examples of the times this Court has suggested to Plaintiffs' counsel – in this case and others – that an expert is needed to analyze the geographic scope of the fallout. Therefore, it is beyond any dispute that Plaintiffs had information about plant emissions and were aware of the potential need to correlate the emissions with a dispersion analysis. These

---

[5] This is also true for the 1992 sulfur dioxide report.

circumstances do not present good reasons for granting an extension after the deadlines have already expired.

B.

Plaintiff has offered James Riffle as an expert for the purpose of commenting on the composition of the discharge. It is unclear which of the new reports necessitates this testimony. As was the case with Mr. Sahu, Plaintiffs' counsel was previously on notice that a composition expert was necessary.[6] In fact, Plaintiffs did obtain an expert, Stephen Paul, prior to the

---

[6] The Court specifically asked for this kind of expert evidence at the March 2008 class certification hearing when it explained to Plaintiffs' counsel what an expert report on composition would address. "It would say I have analyzed this stuff, and it contains the following molecules. It's what we know as coal dust ...." (Transcript of class certification hearing, March 3, 2008, p. 25.)
   The Court went on to say:

   THE COURT: ... I guess I am asking you, I have asked this several times, maybe I asked the question wrong, but is that scientifically possible to do, or is that not? ... I guess I am having a hard time, and maybe it's just my simplistic mind, this is not, to use the same analogy, rocket science. It can either be done or it can't. ... I guess my problem is I got nothing. I got no one who has even attempted to do it. I'm sort of wondering why.

   MR. MACUGA: A, because these folks see it. We have already talked about that.

   THE COURT: Well, that's an excuse for not doing something that's easy. It would cost almost nothing, correct me if I'm wrong, to have someone who knows what they are doing a thousand yards from this smokestack analyze the stuff and say – give an opinion. ...
   ...
   THE COURT: I guess I don't understand – it's sort of the same thing I've been saying for months, and I guess I sort of don't understand why it hasn't been done.

   MR. MACUGA: Well, it has been done.

   THE COURT: I don't see it.

   MR. MACUGA: ... You don't see it here because the expert that we retained – he didn't – he got trapped in a trial. We couldn't contact him. We got his report Friday. I was not going to attempt to introduce an expert report that we received Friday to these gentlemen, who should be able to depose that person and argue in court today.

*(Id.* at 27-28.) Plaintiffs' counsel went on to say, in the class certification hearing, that he would offer more evidence of the composition of the fallout in the merits stage of the case. "Certainly in the merit stage, we are going to have to take the testimony of the interior – or take evidence of the interior of their smokestacks to see what kind of coal is being burned, has been burned, is there soot coagulated in there, how do their blowers work." *(Id.* at 45.)

deadline. If he had had the pertinent qualifications, he could have given opinions about the composition of emissions. Paul apparently collected samples of the particles Plaintiffs complain of and sent them to a lab for testing. Though Plaintiffs now contend that Mr. Paul cannot comment on the new reports and thus Mr. Riffle's opinion is necessary, this Court finds that Plaintiffs were on notice two years ago that they should obtain a discharge composition expert.[7] Nothing in the recently obtained documents creates a need for new experts, other than the possibility that Plaintiffs' current experts are not very well qualified.

The 1993 wind report and the 1997 meteorological report also fail to raise new issues. Plaintiffs could have obtained their own wind and weather reports – some of which are undoubtedly public record – at any time since this litigation began. They offer no reason why they did not collect the records and have a meteorologist analyze them before April of last year, especially when it was clear that Defendant had collected similar evidence by the class certification stage.[8] Thus, the Court will not allow the late addition of a meteorology expert.

III.

Plaintiffs also seek to replace their previous valuation expert, William Patrick Ryder, based on the Court's criticism of Mr. Ryder in a related case. *See Dickens v. Oxy Vinyls*, 3:06CV-364-H, Dkt. Nos. 237-38 (noting that Mr. Ryder "lacks appropriate credentials as an expert in real estate appraising," that "[h]is methodology was cursory," and that his opinion was "both unreliable and unsubstantiated."). The Court is unwilling to allow this switch; to do so

---

[7] The Court does not address here whether Plaintiffs current experts, including Stephen Paul, may opine on the new reports.

[8] *See* Transcript, class certification hearing, March 3, 2008, p. 45 (defense counsel's reference to wind patterns).

would be unfair to Defendants.

Some twenty years ago, the Kentucky legislature set damages in a nuisance case by statute. KRS § 411.560. The attendant case law shows the importance of expert testimony in proving diminution of fair market value. *See Jones v. Jones*, 245 S.W.3d 815, 820 (Ky. App. 2008). Apparently, Plaintiffs were aware of the need for an expert to establish diminution in fair market value because they hired Mr. Ryder to offer such an opinion. Though the problems with Mr. Ryder are numerous, his key failure in *Dickens v. Oxy Vinyls* was the fact that he made an unsupported and, frankly, unbelievable assessment that the Plaintiffs' properties were worthless. He offered this "opinion" without entering any homes, without speaking to any Plaintiffs, sellers, buyers, brokers, Realtors or lenders, and without reviewing any tax assessment data, rental agreements, mortgages or recent sales documents. He did not calculate a change in value from before the nuisance existed. Surely, the publication of this Court's opinion was needed for counsel to know what is expected from an "expert." Indeed, it should have been crystal clear from the time Plaintiffs looked at Ryder's credentials or received his first report in a nuisance case. Thus, the Court's statement of an obvious fact does not constitute a reason for allowing a new expert after the deadline. Plaintiffs may not substitute Mr. Tredwell for Mr. Ryder. [9]

---

[9] On a related note, the Court feels compelled to address what appears to be a recurring problem on the part of Plaintiffs' lead counsel in failing to meet discovery and other deadlines. Plaintiffs' counsel, in this and other cases, has failed to fully comply with the requirements set out in the Federal Rules of Civil Procedure. *See Memorandum Opinion and Order*, July 29, 2008, in *Cochran v. Oxy Vinyls*, (renamed *Dickens v. Oxy Vinyls*) 3:06CV-364-H, Dkt. No. 108, pp. 2-3 ("It is Plaintiffs' counsel's responsibility to retain experts and ensure that they complete their work in time for compliance with Rule 26 deadlines. The Rule is designed to ensure more than simply that parties will begin the process of obtaining experts before the deadline.") Though such conduct is not the primary reason for the Court's denial of new experts, the previous problems do impact the Court's decision. This opinion should, yet again, put Plaintiffs' counsel on notice that if he continues to ignore the Court's rules, he does so at his peril.

IV.

Since the Court's conference on the above matter, several other motions have been submitted or filed. They include Defendant's three pending Motions to Dismiss based on alleged discovery abuses, and Plaintiffs' Motion for a Protective Order to require Defendant to depose Plaintiffs at a convenient time and location. Various other motions for extensions and for supplemental responses are also on file.

Defendant's first Motion to Dismiss, (DN 147), and Plaintiff's Motion for a Protective Order both involve a dispute about the failure of various Plaintiffs to appear for scheduled depositions. Defendant's motion is denied and Plaintiffs' motion is granted to the extent that Defendants must take Plaintiffs' depositions at a location and time convenient to Plaintiffs. This may include scheduling Plaintiff depositions on nights and weekends, as necessary. The Court will allow the parties thirty (30) days to reschedule acceptable deposition times and locations.

Defendant's second Motion to Dismiss relates to Plaintiffs' alleged failure to make their properties available for inspection by Defendant's experts. (DN 148.) The Court will also deny that motion and allow the parties thirty (30) days to resolve the matter. Defendants must conduct their inspections as a time and in a matter which is convenient for Plaintiffs; they should be sensitive to Plaintiffs' schedules.

Defendant's third Motion to Dismiss relates to the alleged failure of various Plaintiffs to respond to written discovery. The Court will give Plaintiffs thirty (30) days to fully comply with all written discovery, otherwise they will be dismissed from the case.

Finally, any other discovery disputes should be resolved among the parties. If agreement is not possible, the parties should call the Court's deputy, Andrea Kash. The Court will hold a

telephonic conference prior to allowing any filing of motions.

cc: Counsel of Record